Raymond E. and Carol J.
GEORGE, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 85–72225–DT.

United States District Court,
E.D. Michigan, S.D.

Oct. 15, 1986.

Nathan B. Driggers, Driggers Schultz Herbst & Paterson, Troy, Mich., for plaintiffs.

Pamela J. Thompson, Asst. U.S. Atty., Detroit, Mich., Thomas R. Jones, Tax Div., Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

JOINER, District Judge (for Judge George E. Woods).

Plaintiffs, Raymond E. and Carol J. George, have filed this action against defendant, the United States of America (and more particularly the Internal Revenue Service), seeking a refund of $23,466.81 in windfall profit taxes paid for the calendar year 1980. Defendant has filed a counterclaim seeking to have certain oil produced by plaintiffs classified as "old," as opposed to "new," oil for the purposes of windfall profit taxation. A bench trial was conducted on this matter on September 29–30, 1986. Based on the evidence produced at trial, and the application of the appropriate law to this evidence, this court holds in favor of plaintiffs.

FINDINGS OF FACT

In Otsego County, Michigan, Shell Western Exploration & Production, Inc. ("Shell") held a significant amount of land acreage under 1968 leases from Styles, et al. ("Styles Lease"), and other acreage under a lease from the State of Michigan ("State-Otsego Lake Lease"). Adjacent to some of this land was property held by the George Group (approximately 1,000 acres) under a 1965 lease from the State of Michigan ("State-Otsego Lake 'B' Lease"). As of 1975, the George Group consisted of the following persons with the following interests:

H.R. Fruehauf, Jr.—25%

Raymond E. George (plaintiff)—25%

Amoco Production Company ("Amoco")—50%

In 1977, the George Group drilled the State Otsego Lake B1–11 oil well on the property it leased from the State of Michigan mentioned above. This well began operation in 1977, and was producing oil in 1978. After this well began pumping oil, Shell, in an attempt to also pump oil in the same area, drilled two dry-holes, called 1–11 and 1–11A, on its State Otsego Lake Lease property. Shell then evaluated the data it obtained from these two dry holes, reinterpreted the data it already had, ran seismic tests in the area, and concluded that a well should be drilled on Shell's own Styles Lease property at a point 198 feet south of the border between the Styles Lease property and the George Group's State Otsego "B" Lease property.

Shell realized that because of Special Order No. 1–73, issued on 1973 by the Michigan Department of Natural Resources, (MDNR) it could not drill a well at that location without unitizing[1] 40 acres of its land with 40 acres of the George Group's State Otsego "B" Lease property which lay due north of it. This was the result of two provisions contained in Special Order No. 1–73: (1) a drilling tract must consist of at least two 40 acre squares (therefore it must consist of 80 acres in the shape of a rectangle); and (2) in order to obtain 100% full allowable production, a well had to be set back at least 460 feet from each boundary of its drilling unit. For Shell to have drilled on its own leased property alone, it would have needed 460 feet of land to the north before hitting the border with the George Group's leased property. As mentioned above, there was only 198 feet separating the optimal drill site and the George Group property.

Shell approached Amoco in 1977, seeking to unitize the George Group's 40 acres (officially designated as the southwest ¼ of the northwest ¼ of Section 11) with Shell's 40 acres (designated as the northwest ¼ of the southwest ¼ of Section 11) to form an 80 acre drilling unit. If the George Group had refused to unitize voluntarily its 40 acres with Shell's 40 acres, Shell could have forced the George Group to unitize on terms and conditions imposed by the MDNR. However, the George Group agreed to unitize its 40 acres, and a written operating agreement and a written unitization agreement were executed in 1978 and 1979. Under these agreements, oil produced and expenses were apportioned among the parties on the basis of their respective interests in the surface area of the drilling unit (Shell–50%, Amoco–25%, Fruehauf–12.5%, and George–12.5%), and that Shell would operate the well. The necessity of compliance with Special Order No. 1–73 in order to create a legal drilling unit was the sole motivation behind this unitization agreement. There was no tax avoidance,[2] nor any other bad faith, motive on the part of plaintiffs or their partners in this venture.

A permit to drill this new well (hereinafter referred to as "Styles 2–11") was issued by the MDNR on January 9, 1979. Drilling began on January 17, 1979, and by June of 1979 Styles 2–11 was put into production. Styles 2–11 was drilled only on property leased to Shell, and while the oil pumped from this well undoubtedly came from the same "reef" as the oil in the George Group's B1–11 well, the evidence is inconclusive as to whether the Styles 2–11 oil came from the same "reservoir" as the B1–11 oil. In mid–1979, Shell drilled another well on property it held under the State Otsego Lake Lease, called 1–11B, which produced oil until 1985, and that well was plugged in 1986.

---

1. "Unitization" is the aggregation of two or more properties together by different owners to form a single property so that it can be operated as a single entity or unit under an arrangement for sharing costs and revenues.

2. At the time of the negotiations (in 1977 and 1978) between Shell and the George Group, no consideration could have been given to the windfall profit tax, as that tax was imposed by the Crude Oil Windfall Profit Tax Act, I.R.C. §§ 4991–4998, enacted April 2, 1980.

Shell certified to the U.S. Department of Energy that the oil pumped from Styles 2–11 was "tier 3" (or "newly discovered" oil), as opposed to "tier 1" ("old" oil). The impact of how this oil was classified was very great, as under the windfall profit tax scheme, new oil was taxed at a 30% rate, while old oil was taxed at a 50% rate. The Department of Energy never challenged this certification, and on their 1980 income tax return, plaintiffs treated their share of the oil from Styles 2–11 as tier 3 oil.

On June 5, 1981, plaintiffs filed a timely claim for a refund of $82,380.76 in windfall profit taxes paid in 1980, based on the application of the net income limitation under I.R.C. § 4988. The I.R.S. began its audit with respect to that claim in July of 1982, and on December 24, 1984, the I.R.S. refunded $58,913.95 to plaintiffs, claiming that the oil from the Styles 2–11 well should be classified as ½ tier 3 and ½ tier 1.

It is plaintiffs' claim that they are entitled to the $23,466.81 still not paid by the I.R.S., as under the applicable rules and regulations the oil from Styles 2–11 is tier 3. In addition, plaintiffs contend that the I.R.S. acted in bad faith when it conducted the audit of plaintiffs' tax refund claim, therefore, they are entitled to an award of their litigation costs under I.R.C. § 7430.[3] Defendant responds that all of the oil that is produced by Styles 2–11 is tier 1 oil, and its December 24, 1984, determination that the oil was only 50% tier 1 was erroneous. As a result, defendant filed its counterclaim under the theory of an erroneous refund (26 U.S.C. § 7405), seeking $23,-466.81 of the $58,913.95 paid to plaintiffs on December 24, 1984. Defendant also flatly denies any allegations of bad faith on its part in the conduct of plaintiffs' audit.

CONCLUSIONS OF LAW

The Crude Oil Windfall Profit Tax Act of 1980, Pub.L. No. 96–23, 94 Stat. 229 (the "Act"), was enacted on April 2, 1980, as part of President Carter's plan for the phased decontrol of crude oil prices. The tax was intended to be on the windfall arising from the decontrol and resulting increase in crude oil prices, and the revenue from the tax was to finance major spending programs to develop new sources of energy, and to promote energy conservation. As an incentive for the increased discovery and production of crude oil, newly discovered crude oil was not subject to price controls, and thus could be sold at market level prices. 10 C.F.R. § 212.79 (1980). The Act also placed newly discovered crude oil in tier 3, which was taxed at the lowest rate (30%) in order to continue the preferred treatment of this oil. I.R.C. § 4992(e).

I.R.C. § 4991(e)(2) directs one to the June 1979 energy regulations prescribed under the Emergency Petroleum Allocation Act [15 U.S.C. § 753(a)] for a definition of what constitutes newly discovered oil. That definition is found in 10 C.F.R. § 212.79 (1980):

> Newly discovered crude oil means domestic crude oil which is ... produced ... from a property from which no crude oil was produced in 1978.

Given the positions of the parties in the instant case and the above definition, the critical question becomes how the term "property" is defined in the context of unitized parcels of land. If the Styles 2–11 drilling unit can be considered to be a property independent of all others for windfall tax purposes, the oil produced from it will be considered tier 3 oil, as no crude oil was produced from this property in 1978. If, on the other hand, the Styles 2–11 unit is not considered a separate property, then the oil produced which is the property of plaintiffs is tier 1 oil.

There is nothing in the Act or the I.R.S. regulations which defines property in the context of unitized parcels of land.[4] In-

---

3. The issue of defendant's alleged bad faith in the conduct of plaintiffs' audit will receive no further attention here, as it will be disposed of in an appropriate post-trial motion.

4. The Internal Revenue Service has recently released proposed regulations dealing with the definition of "property" for the purposes of the Windfall Profit Tax Act. See 51 Fed.Reg. 34,095 (1986) (to be condified at 26 C.F.R. § 51.-4996–4). The definition of property in these

deed, in the six years since the Act was passed, the I.R.S. has only once addressed the definition of property in the context of windfall profit taxes, and in that case [Temporary Treasury Regulation § 150.-4996–1(i) ], the Treasury Department expressly reserved for future decisions what constituted "property" when separate rights to produce have been aggregated (i.e., unitized).

However, guidance can be had from rulings and interpretations issued by the Department of Energy during the era of price controls prior to 1979. Indeed, this court finds that one particular ruling, DOE Ruling 1977–1, 42 Fed.Reg. 3628 (1977), 10 C.F.R. Vol. 2, p. 252 (1986), provides a definition of property that is on point with the facts of the instant case:

> Similarly, in states that maintain spacing requirements for oil wells, individual rights to produce may need to be combined, whether voluntarily or involuntarily, before a single well may be drilled and the right to produce made effective. Such aggregations of rights to produce (sometimes known as 'drilling unit') are also appropriately recognized as single 'properties.'

> Generally speaking, DOE will follow a liberal policy with respect to the aggregation of rights to produce which will be permitted to be treated as a single 'property' as long as a bona fide reason for the aggregation can be demonstrated by the producer.

Applying this ruling to the facts in this case, the conclusion reached is that the Styles 2–11 drilling unit (the 40 acres of Shell property and 40 acres of George Group property) constitutes a single property, separate and apart from those portions of the George Group property which

were not unitized to form the drilling unit. The reason for the unitization was to comply with spacing requirements of Special Order No. 1–73 by the MDNR, as without unitization there could have been no successful drilling of Styles 2–11. No other motive lay behind the aggregation of these two properties to form the Styles 2–11 drilling unit, and because the need for compliance with Special Order No. 1–73 was a bona fide reason for unitization, the oil produced by Styles 2–11 is newly discovered oil as defined in the energy regulations, and is such for the purposes of windfall profit taxation. Consequently, all oil produced by Styles 2–11 in 1980 was taxable at a rate of 30%.[5]

Defendant argues that because the same reservoir may have been penetrated by the George Group when it drilled State-Otsego Lake B1–11 on its own leased property in 1977, and by Shell when it drilled Styles 2–11 in 1979, the oil from Styles 2–11 can not be tier 3 oil. However, this position was expressly rejected by Congress when it passed the Act. The Joint Explanatory Statement of the Conference Committee on the Act compared the House provisions with the Senate provisions on newly discovered oil:

> House Bill.—Newly discovered oil generally has the same definition as under price controls. However, oil produced from a property which produced any oil in commercial quantities after 1969, and prior to 1979, does not qualify as newly discovered oil. *In addition, newly discovered oil does not include oil produced from a reservoir on any tract or parcel of land if the reservoir was penetrated after 1969, and prior to 1979, by a well on that tract or parcel from which oil was produced in commercial*

proposed regulations is consistent with the Department of Energy ruling cited below, and the holding of this court. *See* proposed 26 C.F.R. § 51.4996–4(e)(1)(iv.).

**5.** *Hunt Oil Company Interpretation,* 1980–17, 45 Fed.Reg. 46787 (1980), relied on by defendant, is unpersuasive. There, the same party effectively owned/controlled both parcels of land

that were unitized, and there was a serious question as to whether there was a bona fide reason for unitization. While that decision does indicate that a single entity may not unitize two parcels it owns/controls, that does not apply here, as the George Group and Shell were independent entities.

*quantities if oil could have been produced from the penetrated reservoir through that well prior to 1979.*

Senate amendment.—Newly discovered oil is defined as it is under price controls. The Secretary's general authority to adopt price control regulations for use in the windfall profit tax includes the authority to make technical amendments to the pricing definition.

Conference agreement.—*The conference agreement follows the Senate amendment. For windfall profit tax purposes, therefore, newly discovered oil includes production from a property which did not produce oil in commercial quantities during calendar year 1978.* Thus, it includes production from a property on which oil was produced in 1978 if that production was incident to the drilling of exploratory or test wells and was not part of continuous or commercial production from the property during 1978.

H.Conf.Rep. No. 96–817, 96th Cong. 2d Sess. 97, 98 (1980), reprinted in 1980 U.S. Cong. Code & Ad News 410, 650, 651 (emphasis added). The House attempted to define newly discovered oil, in part, by reference to a reservoir theory similar to that being forwarded by defendant, but that theory was rejected when the final form of the Act was passed. Because the Congress rejected the reservoir theory when it enacted the Windfall Profit Tax Act, this court rejects defendant's position as well.

## SUMMARY

Because the Styles 2–11 oil owned by plaintiffs is newly discovered oil for the purposes of windfall profit taxation, it is tier 3 oil, and it should have been taxed at the 30% rate for calendar year 1980. Plaintiffs are therefore entitled to a refund of $23,466.81 from their 1980 windfall profit taxes, plus interest. As to litigation costs, plaintiffs should raise this issue in an appropriate post-trial motion.

Accordingly, judgment is entered in favor of plaintiffs.

SO ORDERED.